IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:23-cv-01204-CNS-NRN

DILIP BALAKRISHNAN,

    Plaintiff,

v.

TTEC DIGITAL LLC, a Colorado limited liability company,

    Defendant.

---

# ORDER

---

Before the Court are three separate but closely related motions: (1) Defendant/Counterclaim Plaintiff TTEC Digital's Opposed Motion for Declaratory Judgment and Request for Expedited Determination with Speedy Hearing, ECF No. 68; (2) TTEC's Opposed Motion for Specific Performance and Request for Expedited Determination with Speedy Hearing, ECF No. 70; and (3) Plaintiff Dilip Balakrishnan's Opposed Motion to Dismiss TTEC's Counterclaims, ECF No. 77. For the reasons explained below, the Court DENIES TTEC's motions and GRANTS in part and DENIES in part Mr. Balakrishnan's motion.

## I. FACTUAL BACKGROUND

This case arises from the parties' execution of a February 7, 2020 Stock Purchase Agreement (SPA). ECF No. 67 (TTEC's Countercl.), ¶¶ 1, 14; ECF No. 67-4 (SPA). In

1

executing the SPA, TTEC acquired 70% of Serendebyte Inc., the company Mr. Balakrishnan founded. Countercl., ¶¶ 14, 21.

The SPA permitted Mr. Balakrishnan, on behalf of Serendebyte's rolling shareholders (including himself), to sell the remaining 30% of Serendebyte to TTEC during the period of January 31, 2023, to December 31, 2023, which the SPA defines as the "Put Option." *Id.*, ¶ 29; SPA, § 8.02. The buyout price for the remaining 30% of Serendebyte was based on Serendebyte's financial performance over the previous three-year period. Countercl., ¶ 30; SPA at 2 (defining pre-agreed formula).

On December 8, 2023, Mr. Balakrishnan notified TTEC that he, as the majority seller, was electing to exercise the Put Option pursuant to § 8.02. Countercl., ¶ 2. Mr. Balakrishnan's exercise notice calculated the amount of the second buyout—the remaining 30% of the shares—at $300,000. ECF No. 68 at 3. Mr. Balakrishnan identified the closing date as February 6, 2024. *Id.* TTEC agreed to process the Put Option request provided that Mr. Balakrishnan also complied with his obligations under § 8.02 and § 8.04, which, according to TTEC, included signing a full release—requiring him to dismiss this lawsuit against TTEC. *Id.* Mr. Balakrishnan refused, claiming that § 8.02 and § 8.04 do not require a release for the Put Option to be exercised. *Id.* at 4.

The central issue before the Court in the instant motions is whether those provisions require Mr. Balakrishnan to sign a full release of all claims prior to exercising the Put Option.

2

## II. PROCEDURAL BACKGROUND

Mr. Balakrishnan initiated this lawsuit on May 12, 2023. ECF No. 1. He alleged that TTEC breached its implied obligation under the SPA to support Serendebyte, and that TTEC fraudulently induced him to execute the SPA by falsely representing that it could and would support Serendebyte after the 70% acquisition. *See generally id.*; ECF No. 47 (Am. Compl.).

On November 16, 2023, this Court dismissed without prejudice Mr. Balakrishnan's claims of unjust enrichment, breach of the implied duty of good faith and fair dealing, and negligent misrepresentation, but it permitted him to proceed with his fraudulent inducement claim. ECF No. 44. Mr. Balakrishnan filed his Amended Complaint shortly thereafter, maintaining his fraudulent inducement claim and adding a breach of indemnification claim pursuant to the terms of the SPA. *See* Am. Compl.

Since Mr. Balakrishnan exercised the Put Option on December 8, 2023—seven months after filing his lawsuit—the parties have engaged in back-and-forth arguments concerning the purported release. *See* Countercl., ¶¶ 44–46. Having reached an impasse, on January 30, 2024, TTEC filed an Amended Answer to Mr. Balakrishnan's Amended Complaint, and at the same time, filed two Counterclaims. TTEC first seeks a declaratory judgment that the SPA requires Mr. Balakrishnan to "execute a full release" of his claims. *Id.*, ¶¶ 77–96. TTEC's second claim for breach of contract seeks specific performance of the SPA (i.e., requiring Mr. Balakrishnan to execute a full release of all claims). *Id.*, ¶¶ 97–124.

The same day it filed its Counterclaims, TTEC filed its motion for declaratory judgment and motion for specific performance. ECF Nos. 68, 70. TTEC requested expedited determination of both motions; it asked this Court to rule on its January 30, 2024 motions prior to February 6, 2024—the date Mr. Balakrishnan identified as the closing date in his December 8, 2023 exercise notice. Finally, on February 13, 2024, Mr. Balakrishnan moved to dismiss TTEC's counterclaims. ECF No. 77. These motions are now fully briefed.

Finally, the Court notes that discovery is ongoing in this matter. Discovery is currently set to close on July 15, 2024, and the deadline for dispositive motions is August 23, 2024. ECF No. 97.

### III.  LEGAL STANDARDS

#### A. Declaratory Judgment

The Declaratory Judgment Act grants courts the authority to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see also* Fed. R. Civ. P. 57 ("These rules govern the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201."). "Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a).

The Federal Rule of Civil Procedure 57 Advisory Committee noted that

> [a] declaratory judgment is appropriate when it will "terminate the controversy" giving rise to the proceeding. Inasmuch as it often involves only an issue of law on undisputed or relatively undisputed facts, it operates frequently as a summary proceeding, justifying docketing the case for early hearing as on a motion.

4

Fed. R. Civ. P. 57.

### B. Specific Performance

"Specific performance is an equitable remedy designed to protect a party's expectation under a contract by compelling the other party to perform its agreed upon obligation." *Sarissa Capital Domestic Fund LP v. Innoviva, Inc.*, No. 2017-0309-JRS, 2017 WL 6209597, at *26 (Del. Ch. Dec. 8, 2017) (unpublished) (citation omitted).[1] "A party seeking specific performance must establish that (1) a valid contract exists, (2) [it] is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance." *Osborn ex. rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010).

### C. Federal Rule of Civil Procedure 12(b)(6)

Mr. Balakrishnan moves to dismiss the Counterclaims under Federal Rule of Civil Procedure 12(b)(6). ECF No. 77 at 1. Under Rule 12(b)(6), the dispositive inquiry is whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must take all the factual allegations in the complaint as true and "view these allegations in the light most favorable" to the nonmoving

---

[1] The SPA is governed by Delaware law. SPA, § 9.10(a) ("This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware . . . ."). Therefore, the Court will apply Delaware substantive law but federal procedural law. *See Friends of Tuhaye, LLC v. Tuhaye Homeowners Ass'n*, 777 F. App'x 903, 907 (10th Cir. 2019).

5

party. *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010). On a Rule 12(b)(6) motion, a court's function is "not to weigh potential evidence that the parties might present at trial, but to assess whether the [] complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003).

### IV.   ANALYSIS & ORDER

#### A. TTEC's Request for Declaratory Judgment (ECF No. 68)

TTEC seeks a declaration that Mr. Balakrishnan triggered an obligation to execute a release pursuant to § 8.02. ECF No. 68 at 7. It is undisputed that on December 8, 2023, Mr. Balakrishnan voluntarily elected to exercise the Put Option pursuant to § 8.02. ECF No. 67-1 (Dec. 8, 2023 Letter from D. Balakrishnan to TTEC). Section 8.02 of the SPA states as follows:

> **Put Option**. At any time during the Option Period, Majority Seller shall have the right and not the obligation to sell all (and not less than all) of the Retained Shares (as held by the Rolling Shareholders) to Buyer, *on the terms and conditions set forth in this Section 8.02* (the "**Put Option**").

SPA, § 8.02 (italics added). To effectuate the sale triggered by Mr. Balakrishnan's exercise notice, he was required to

> enter into such documents and instruments as shall be reasonably necessary to facilitate the closing of the Put Sale, including without limitation . . . (2) *release from each Rolling Shareholder as set forth in Section 8.04 below* . . . . (5) such other . . . legal deliverables as reasonably requested by Buyer in order to effect the transactions contemplated hereunder and documentation of a surrender of the Retained Shares . . . .

6

*Id.*, § 8.02(c) (italics added). For the instant purposes, § 8.04 provides the final piece of the puzzle, which states as follows:

> **Section 8.04 Release**. As a condition to each Rolling Shareholder receiving such Rolling Shareholder's Proportionate Buyout Consideration Amount, *each Rolling Shareholder will deliver to Buyer an executed release in the form of Schedule 8.04* at and effective as of the Call Purchase Date or Put Purchase Date and upon receipt of [] such Rolling Shareholder's Proportionate Buyout Consideration Amount.

*Id.*, § 8.02(c) (italics added).

It is also undisputed that Schedule 8.04 was not attached to the SPA. ECF No. 68 at 9 (admitting that, "[u]pon information and belief, through oversight of counsel, there was no Schedule 8.04 actually attached to the SPA"). TTEC does not even allege that Schedule 8.04 ever existed, but it does allege that "[n]othing in §§ 8.02(c) or 8.04 require that the release be drafted before executing the SPA." Countercl., ¶ 65. Nevertheless, TTEC asks this Court to declare that § 8.02 and § 8.04 contemplate and require the signing of a "full release," specifically including the claims asserted by Mr. Balakrishnan in this lawsuit. ECF No. 68 at 13.

According to TTEC, "release," as used in the SPA, unambiguously requires a general or full release intended to cover all claims. *Id.* at 10–11 ("'Release', as used in the SPA, the industry, and the Parties in this same transaction, unambiguously means a full release of all claims."). Mr. Balakrishnan also argues that "release" is unambiguous, but he does not say what he thinks the term means. ECF No. 82 at 13. Rather, he argues that the provision is "unenforceable on its face" because the term requires the parties to

7

agree on the terms of the release at a later date (i.e., it is an unenforceable agreement to agree). *Id.*, ECF No. 77 at 8–9.

Whether a contract provision is ambiguous is a question of law. *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006). "Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Penton Bus. Media Holdings, LLC v. Informa PLC*, 252 A.3d 445, 461 (Del. Ch. 2018) (citation omitted). Once a court finds ambiguity, determining the proper application of the ambiguous contract provision becomes an issue for the factfinder to decide. *Hughes v. Kelly*, No. CIVA 4814VCN, 2010 WL 3767624, at *3 (Del. Ch. June 30, 2010). A court "cannot choose between reasonable interpretations of ambiguous contract provisions, even where one interpretation is, perhaps, 'more reasonable.'" *Id.* (quoting *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1292 (Del. 2007)).

Here, the Court finds that "release," as used in the SPA, is ambiguous. It could, as TTEC argues, mean a full release of all claims. But as explained more fully below, it could also mean, as Mr. Balakrishnan argues, that the parties merely agreed to agree on the terms of the release at a later date. ECF No. 77 at 8–9. Or it could mean that Mr. Balakrishnan was required to release only those claims related to his stock options and not his employment. ECF No. 82 at 11. The Court therefore finds that the term is reasonably susceptible to more than one meaning.

TTEC primarily relies on two cases to support its expansive definition of release. Relying on *Hob Tea Room v. Miller*, 89 A.2d 851 (Del. 1952), TTEC first argues that

general releases are commonly used and their "validity is unchallenged." ECF No. 68 at 11 (quoting *Hob Tea*, 89 A.2d at 856). This unexceptional position, however, does not get at the heart of the issue. In *Hob Tea*, the contracting parties signed a written release that included key language absent in the SPA. Specifically, the parties expressly agreed to "*forever release and discharge each other, their Heirs, Executors, Administrators and Assigns from any further claim or demand whatsoever* pertaining to the above recited agreement bearing date the Fifth day of October, A. D. 1945." *Hob Tea*, 89 A.2d at 854 (emphasis added).

TTEC then cites *Chakov v. Outboard Marine Corp.*, 429 A.2d 984 (Del. 1981). According to TTEC, *Chakov* supports the notion that "release" here "means general release, which should have been clear to Mr. Balakrishnan (and his counsel)." ECF No. 68 at 12. *Chakov*, however, contained similar (i.e., expansive) release language as *Hob Tea*. The pertinent language of the release provided that the

> *undersigned hereby releases and forever discharges* Alfred H. Marshall, his heirs, executors, administrators, agents and assigns, and all other persons, firms or corporations liable or who might be claimed to be liable, none of whom admit any liability to the undersigned but all expressly deny any liability, *from any and all claims, demands, damages, actions, causes of action or suits of any kind or nature whatsoever*, and particularly on account of all injuries, known and unknown, both to person and property, which have resulted or may in the future develop from an accident which occurred on or about the twenty-first day of August, 1977 at or near Chesapeake and Delaware Canal.

*Chakov*, 429 A.2d at 985 (emphasis added).

The Court is not persuaded by either *Hob Tea* or *Chakov*. A cursory review of the releases in those cases demonstrates that they are nothing like the release at issue here.

The releases in *Hob Tea* and *Chakov* clearly identify the releasing parties, the released parties, the timeframe of the release, and perhaps most importantly, the scope of the release or claims being released. In contrast, the SPA fails to identify any of those essential terms, instead merely requiring Mr. Balakrishnan to deliver "an executed release in the form of Schedule 8.04," which does not exist. SPA, § 8.04.

TTEC has provided no evidence of what the parties intended when they used the term release in the SPA, much less that it unequivocally meant "a full, final release." ECF No. 68 at 13. Had the parties, each sophisticated and represented by counsel, intended "release" to mean "full release" or "complete release" in the SPA, they could have said so.

The only possible evidence that could support TTEC's claim is the Sample Severance Agreement and Release of Claims attached to Mr. Balakrishnan's Executive Employment Agreement between TTEC, Serendebyte, and Mr. Balakrishnan. ECF No. 84 (Executive Employment Agreement). That agreement, unlike the SPA, attached a sample release of claims. *Id.* at 13–17 ("Exhibit B to Executive Employment Agreement – *Sample* Severance Agreement and Release of Claims"). Section 8 of the Sample Severance Agreement and Release of Claims expressly states that it is a "general release of all claims." *Id.* at 14. In addition to defining the release as a "general release," the release provision lists several examples of what it includes, all of which are employment-related. *Id.*, § 8(a)–(d) (for example, releasing claims related to Title VII, the ADA, the Equal Pay Act, wrongful discharge, back pay, PTO pay, and whistleblower laws). Critically, the Sample Severance Agreement and Release of Claims set forth in Exhibit B

10

was only applicable if Serendebyte (now 70% owned by TTEC) terminated Mr. Balakrishnan without cause, and Mr. Balakrishnan in turn wished to receive the executive severance compensation. Executive Employment Agreement, § 6(b).[2]

The Court cannot agree with TTEC that, because of the sample release attached to Mr. Balakrishnan's Executive Employment Agreement, the parties "clearly understood that when and/or if the situation arose, TTEC would be entitled to a full and final release." ECF No. 68 at 12. Rather, the sample release—which was employment, not stock

---

[2] The entire termination provision provides as follow:

> **Termination by the Company without Cause.** Subsequent to the Interim Period, and upon 30 days written notice, the Company, in its sole discretion, may terminate Executive's employment without Cause (as *"Cause"* is defined above). If, subsequent to the Interim Period, the Executive remains an employee of the Company and the Company terminates the Executive's employment without Cause pursuant to this Section and the Executive executes a separation agreement in a form substantially similar to the agreement set forth in Exhibit B (attached hereto), releasing all legal claims except for those that cannot legally be released and the Executive continues to comply with all terms of such separation agreement, and any other agreements signed by the Executive with the Company, then the Company shall pay the Executive severance compensation in accordance with the then current Company's severance policy. If Company does not have a severance policy in place, then, severance will be paid in accordance with TTEC's severance policy. Salary continuation payments will be made at the Company's regular payroll intervals, provided, however, payments accruing for payroll periods prior to the date that the Company has received a signed and effective separation agreement and release shall be suspended and paid on the first payroll date following the effective date of the separation and release. If the Executive's employment is seconded and the Executive receives any compensation by reason of termination under the local law of the seconded entity **("Local Severance"),** any Local Severance received by the Executive shall be credited towards any severance payable under this Section 6(b). If the amount of Local Severance is higher than severance that the Executive would have otherwise be entitled to under this Section 6(b), then the Executive shall reimburse Company any exceeding amounts.

ECF No. 84 at 7–8.

focused, and only triggered if (1) his former company terminated him without cause, and (2) he elected to receive the company's executive severance compensation—strongly suggests that it would not apply to the SPA or Put Option.

At this early junction, based on the limited record before it, the Court cannot rule as a matter of the law that "release" means full or complete release. Nor can it rule as a matter of law that the term is "unenforceable as indefinite." TTEC's motion for declaratory judgment is denied.

### B. TTEC's Request for Specific Performance (ECF No. 70)

Having exercised the Put Option on December 8, 2023, TTEC now seeks an order from the Court requiring Mr. Balakrishnan to execute a full release of his claims.[3] ECF No. 70. TTEC asserts nearly identical arguments as it does in its motion for declaratory judgment, namely that § 8.02 and § 8.04 contemplate a full or complete release of all claims, including Mr. Balakrishnan's instant lawsuit.

For the same reasons the Court is denying TTEC's motion for declaratory judgment, the Court also denies TTEC's request for specific performance.

---

[3] The "General Release of Claims" that TTEC wants Mr. Balakrishnan to sign is attached to TTEC's motion for declaratory judgment. ECF No. 68-4 (Dec. 28, 2023 Letter from TTEC's Assistant General Counsel to D. Balakrishnan). The "General Release of All Claims" section is similar to the sample release in that it is employment-focused. *Id.*, § 2. Section four of the General Release of Claims, however, is titled "Withdrawal of Lawsuit," which specifically references Mr. Balakrishnan's instant lawsuit. *Id.*, § 4. It therefore deviates from the sample release in a material way, suggesting that the language in the sample release may not have been broad enough to encompass non-employment-related claims such as the claims in Mr. Balakrishnan's Amended Complaint. Regardless, the release here has been catered to address actions that had not occurred at the time the release should have been attached to the SPA.

### C. Mr. Balakrishnan's Motion to Dismiss Counterclaims (ECF No. 77)

The other side of the coin is Mr. Balakrishnan's motion to dismiss TTEC's Counterclaims. ECF No. 77. He first argues that TTEC's declaratory judgment claim must be dismissed as duplicative of its breach of contract claim. *Id.* at 6. He then argues that TTEC's breach of contract claim is subject to dismissal because § 8.04 of the SPA is unenforceable as indefinite, and TTEC failed to sufficiently plead it was damaged by the alleged breach. *Id.* at 7–10. The Court addresses each in turn.

1. *Declaratory Judgment Claim*

In its first claim for relief, TTEC seeks a declaration that

> (1) Section 8.04 of the SPA is valid, enforceable and contemplates a full release; (2) TTEC has a right and is entitled to a full release in order to pay the proportional buyout consideration amount (30%) under the SPA; and (3) that Mr. Balakrishnan has an obligation to execute a full release pursuant to Section 8.02.

Countercl., ¶ 96. In its second claim for relief, TTEC argues that Mr. Balakrishnan has breached and continues to breach his obligations under the SPA by refusing to execute a full release of his claims. *See id.*, ¶ 107 ("Mr. Balakrishnan refuses to execute a release in any form."); *id.*, ¶ 111 ("For relief TTEC seeks specific performance requiring Mr. Balakrishnan to comply with his obligations pursuant to §§ 8.02 and 8.04 of the SPA, including *inter alia* executing a full release."); *id.*, ¶ 114 ("TTEC is entitled to equitable relief requiring Mr. Balakrishnan sign a full release as required in by §§ 8.02 and 8.04.").

It is plain to the Court that TTEC's first claim for relief is duplicative of its second. Delaware courts have held that "there is no need for a declaratory judgment where a claimant does have recourse to the common law." *Blue Cube Spinco LLC v. Dow Chem.*

13

*Co.*, No. CVN21C01214PRWCCLD, 2021 WL 4453460, at *15 (Del. Super. Ct. Sept. 29, 2021). "Put differently, where a claimant merely has repackaged in the language of a declaration an adequately-pleaded affirmative count, the 'declaration' is duplicative and not viable." *Id.* (collecting cases where courts dismissed declaration counts as duplicative). Thus, for TTEC to survive dismissal on count one, its declaratory request must be distinct from its breach of contract claim such that a decision on contract claim would not resolve the declaration claim. *Id.*; *see also Sweetwater Point, LLC v. Kee*, No. CV S18C-06-012 RFS, 2020 WL 6561567, at *12 (Del. Super. Ct. Nov. 5, 2020), *aff'd sub nom. Lehman Bros. Holdings, Inc. v. Kee*, 268 A.3d 178 (Del. 2021) ("Where a declaratory judgment claim is completely duplicative of the affirmative counts of the complaint, it must be dismissed."). It is not.

Accordingly, the Court will dismiss TTEC's declaratory judgment claim without prejudice.

        2.   Breach of Contract Claim

Under Delaware law, to survive a motion to dismiss for failure to state a breach of contract claim, a plaintiff must sufficiently allege that (1) a contract existed between the parties, (2) the defendant breached his obligation imposed by the contract, and (3) the plaintiff suffered damages as a result of the defendant's breach. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

Mr. Balakrishnan does not deny that he entered into the SPA with TTEC. Indeed, he alleges in his first claim for relief that TTEC breached the indemnification provision of

the SPA. Am. Compl. ¶¶ 91–110. However, he challenges the second and third elements of the breach of contract claim.

As discussed at length, TTEC alleges that Mr. Balakrishnan breached the SPA by failing to execute a release after exercising the Put Option. Countercl., ¶¶ 102–08. For damages, TTEC alleges that it has sustained and continues to sustain damages from Mr. Balakrishnan's alleged breach, including ongoing litigation costs and reputational harm from having to notifying its business partners about the alleged fraud.[4] Countercl. ¶ 110. Mr. Balakrishnan argues that these allegations fail because they "assume that a release under Section 8.04 includes Plaintiff's claims in this lawsuit." ECF No. 77 at 9. And, he continues, because the scope of the release in § 8.04 is indefinite, it cannot be enforced. *Id.*

The Court has already determined that, based on the record before it, it cannot conclude as a matter of law that "release," as used in the SPA, is indefinite.[5] Therefore,

---

[4] The Court notes that TTEC's second category of purported damages is suspect. Mr. Balakrishnan's fraudulent inducement claim and TTEC's breach of contract claim are predicated on different events. Had Mr. Balakrishnan not exercised the Put Option, TTEC would not have any Counterlcaims. *See* Countercl., ¶ 2 ("This action arises from Mr. Balakrishnan's (as the Majority Seller) voluntary election to exercise the Put Option (on behalf of the Rolling Shareholders) pursuant to § 8.02 of the SPA. . . . TTEC has agreed to process the Put Option request provided that Mr. Balakrishnan also complies with the obligations under § 8.02, including inter alia executing a release pursuant to § 8.04."). Thus, the purported "reputational harm" would have happened even if Mr. Balakrishnan decided not to exercise his option.

[5] To be sure, whether a contract provision is sufficiently definite is usually a question of law. *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1232 (Del. 2018). "A contract is sufficiently definite and certain to be enforceable if the court can—based upon the agreement's terms and applying proper rules of construction and principles of equity—ascertain what the parties have agreed to do." *Id.* However, having determined that "release" is ambiguous here, the parties should have the opportunity to complete discovery before the Court rules on whether "release" is sufficiently definite to be enforceable. Indeed, in his opposition to TTEC's motion for specific performance, Mr. Balakrishnan argues that, if the Court determines that § 8.04 is ambiguous, he should have the opportunity to "elicit evidence—such [as] communications between Plaintiff and Defendant, communications internal to Defendant, and other evidence of the Parties' intent—showing that the Parties never agreed on the terms of a release under Section 8.04." ECF No. 81 at 14–16.

15

at this early stage, the Court finds that TTEC has adequately pleaded its breach of contract claim.

## V. CONCLUSION

Consistent with the above analysis, the Court makes the following ruling:

(1) TTEC's Opposed Motion for Declaratory Judgment and Request for Expedited Determination with Speedy Hearing, ECF No. 68, is DENIED;

(2) TTEC's Opposed Motion for Specific Performance and Request for Expedited Determination with Speedy Hearing, ECF No. 70, is DENIED; and

(3) Plaintiff Dilip Balakrishnan's Opposed Motion to Dismiss TTEC's Counterclaims, ECF No. 77, is GRANTED in part and DENIED in part.

DATED this 16th day of April 2024.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge