IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-01204-CNS-NRN

DILIP BALAKRISHNAN,

Plaintiff,

v.

TTEC DIGITAL LLC, a Colorado limited liability company,

Defendant.

---

### ORDER ON DEFENDANT'S MOTION TO COMPEL (ECF No. 111)

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This matter comes before the Court on Defendant TTEC Digital LLC's ("TTEC") Motion to Compel, filed June 10, 2024. ECF No. 111. Plaintiff Dilip Balakrishnan ("Plaintiff") filed his opposition the motion on June 20, 2024. ECF No. 118. The Court heard argument on the motion on July 16, 2024 and took the motion under advisement. *See* ECF No. 127. Having considered the arguments of the Parties and the materials submitted in connection with the motion, the Court has determined the Motion to Compel will be **GRANTED in part**.

### I.   BACKGROUND

This is a commercial business dispute arising out of a February 7, 2020 Stock Purchase Agreement ("SPA"). In executing the SPA, TTEC acquired 70% of Serendebyte Inc., the company founded by Plaintiff.

Plaintiff initiated this lawsuit on May 12, 2023. ECF No. 1. He alleges that TTEC fraudulently induced him to execute the SPA by falsely representing that it could and would support Serendebyte after the 70% acquisition. *See generally* Am. Compl., ECF No. 47. Plaintiff claims that TTEC's promises to provide support for Serendebyte and to allow Plaintiff to run Serendebyte post-acquisition were either intentionally or recklessly false because TTEC did not actually intend to fulfill those promises or TTEC was recklessly indifferent as to whether it would or could provide the support it had promised.

In his Amended Complaint, Plaintiff alleges that during discussions leading to the sale of Serendebyte, Plaintiff was made false promises that ultimately caused him to sell his company. TTEC's promises, some of which were reflected in a non-binding Letter of Intent ("LOI"), were that TTEC would provide Serendebyte access to its "extensive global network of clients, sales leaders and complementary capabilities to further expand the Company's topline growth and profit margins. One of the primary value-drivers, addressed in this LOI is the integration with and ability to grow the business under TTEC." *Id.* ¶¶ 1–2. Per the Amended Complaint, the purpose of the sale, "as articulated in the LOI," was to allow Serendebyte shareholders to "realize a partial liquidity event while also having the opportunity to roll a portion of their current equity to take advantage of the growth and vision of the Business over the next 3 years." *Id.* ¶ 3.

Plaintiff claims the Serendebyte has not achieved the level of value that it would have had TTEC delivered on what it had repeatedly promised to do in the LOI and the negotiations for the SPA. Plaintiff also claims that since the Parties entered into the

2

SPA, Serendebyte's value has been unfairly diminished because of TTEC's failure to comply with the promises it made to Plaintiff.

The SPA permitted Plaintiff, on behalf of Serendebyte's rolling shareholders (including himself), to sell the remaining 30% of Serendebyte to TTEC during the period of January 31, 2023, to December 31, 2023, which the SPA defines as the "Put Option." The buyout price for the remaining 30% of Serendebyte was based on Serendebyte's financial performance over the previous three-year period. Plaintiff claims that Serendebyte's value was being unfairly diminished because of TTEC's failure to comply with the promises that it had made, thus depriving Plaintiff of the true value to which he should have been entitled for his remaining 30 percent share of the Serendebyte. *Id.* ¶ 9.

On December 8, 2023, Plaintiff notified TTEC that he, as the majority seller, was electing to exercise the Put Option pursuant to the SPA. Plaintiff's exercise notice calculated the amount of the second buyout—the remaining 30% of the shares—at $300,000. ECF No. 68 at 3. Plaintiff identified the closing date as February 6, 2024. TTEC agreed to process the Put Option request, provided that Plaintiff also complied with his obligations under other provisions of the SPA which, according to TTEC, included signing a full release requiring him to dismiss his lawsuit against TTEC. *Id.* Plaintiff refused, claiming that those sections of the SPA do not require a release for the Put Option to be exercised.

On November 16, 2023, Judge Charlotte N. Sweeney dismissed without prejudice Plaintiff's claims of unjust enrichment, breach of the implied duty of good faith and fair dealing, and negligent misrepresentation, but she permitted him to proceed with

3

his fraudulent inducement claim. ECF No. 44. Plaintiff filed his Amended Complaint shortly thereafter, maintaining his fraudulent inducement claim and adding a breach of indemnification claim pursuant to the terms of the SPA. *See* ECF No. 47.

TTEC has filed counterclaims against Plaintiff insisting that Plaintiff is required to sign a full release of claims to exercise his Put Option. The SPA contemplates the execution of a release for Plaintiff to exercise his Put Option, but the form of release to be signed was not attached to the SPA. On April 16, 2024, Judge Sweeney found the release provision of the SPA to be ambiguous (in part because it did not specify whether it was to be a complete or more limited release) and denied TTEC's motion for a declaratory judgment and for specific performance on the question whether Plaintiff must release his claims and drop his lawsuit to exercise his Put Option. *See* ECF No. 99.

Thus, there will be two critical factual issues to be decided when this case goes to trial. The first is to what degree did Plaintiff understand the representations that were being made to him before he signed the final SPA, including whether he understood the preliminary, non-binding nature of the LOI, his understanding of the oral representations that were made, and whether he believed them to be binding (even if they were not reflected in the final SPA). Second, is the Parties' understanding of the requirement that to exercise his Put Option, Plaintiff would have to execute a release, and what that release would entail.

## II. THE CURRENT DISCOVERY DISPUTE

The current discovery dispute arises from Plaintiff's assertion of the attorney client privilege with respect to more than 1,000 documents (1,005 to be precise) that

would otherwise be responsive to TTEC's requests for production of documents. TTEC seeks to compel production of those documents.

In seeking the disputed documents, TTEC argues that Plaintiff is seeking $15 million in fraud damages claiming that he was fraudulently induced and involuntarily executed the SPA, even though his very sophisticated counsel, (the same law firm and lawyer that is representing him in this case) participated in negotiating and drafting the SPA on his behalf. Per TTEC, Plaintiff "feigns ignorance over the terms and negotiations, disputes the parties' intent, and relies on communications with counsel to promote his post-hoc interpretations of the deal documents." ECF No. 111 at 1. TTEC claims that Plaintiff is withholding approximately 45% of the documents responsive to TTEC's discovery responses based on attorney client-privilege despite (in TTEC's view) putting these communications directly at issue in this $15 million lawsuit. Thus, TTEC requests that the Court compel production of the withheld and claimed attorney-client documents relating to the sale of Serendebyte and the negotiation and drafting of the SPA. Alternatively, TTEC requests in-camera inspection of the documents (or some portion of them) to verify the assertion of privilege. *Id.* at 2.

TTEC divides the disputed documents into three categories, highlighted in a color-coded version of Plaintiff's privilege log. The categories are:

1. Documents that involve the negotiation/execution of the SPA and related acquisition documents (712 documents);

2. Documents that involve the pre-LOI and LOI negotiation/execution (128 documents); and

5

3. Documents which involve negotiations to sell Serendebyte to Luxoft and Tech Mahindra—other potential suitors besides TTEC (seven documents).

TTEC argues that the documents should be produced because Plaintiff either has failed to establish that the attorney-client privilege applies or has waived the attorney-client privilege by claiming fraud by TTEC (and ignorance by Plaintiff) with respect to the precise deal terms.

TTEC argues that there are two reasons, under Delaware law (which applies to the privilege analysis here per ¶ 9.10(a) of the SPA), why these documents should be compelled. First, under Delaware law, the attorney-client privilege does not apply to or protect communications between parties or their attorneys when those communications concern a "common commercial objective." Thus, communications in which counsel is trying to "get people to sign things"—even draft contracts or communications approving redlines, rejecting terms, or proposing changes that were intended to be forwarded on to TTEC—are not privileged. TTEC therefore argues that Plaintiff has not met his burden to establish that these withheld documents are actually covered by the attorney-client privilege.

Second, TTEC argues that Plaintiff has put the LOI and SPA at issue and thereby waived any attorney-client protection that would otherwise be afforded those documents. TTEC contends that the attorney-client privilege is waived when a party places arguably privileged material at issue by injecting either the privileged communication itself into the litigation or introduces an issue into the litigation the truthful resolution of which requires an examination of confidential communications.

6

Here, TTEC argues that Plaintiff has injected his knowledge of the final terms of the SPA and his alleged justifiable reliance on TTEC's representations into the case, knowing that TTEC would require discovery of the issue as part of its defense. In support of its argument, TTEC has provided excerpts from Plaintiff's deposition, including a passage where he explains his understanding of the term "nonbinding" with respect to the LOI. ECF No. 112-3 at 9–10. In addition, Plaintiff has submitted an expert report that relies extensively on pre-LOI negotiations and the LOI itself in support of the claim that the remaining 30% share of Serendebyte is worth (or would be worth) $15 million had TTEC lived up to its promises. For example, the expert's first opinion is that ""Mr. Balakrishnan has incurred damages of between $3.75 million and $15.0 million due to his reliance on the false or reckless promises of TTEC." ECF No. 111-6 at 2.

In sum, TTEC's waiver argument is that Plaintiff has waived the attorney-client privilege because "he injected issues involving his knowledge, understanding, intent and justifiable reliance during the negotiation and drafting of the LOI and SPA—the truth of which requires disclosure of those documents." ECF No. 111 at 11.

In response, Plaintiff insists that TTEC has mischaracterized his claims. Plaintiff says that he does not "assert ignorance over the terms and negotiations of the [Stock Purchase Agreement], dispute the parties intent with respect to the SPA, or rely on communications with Jayaram Law to support his interpretation of the [SPA." ECF No. 118 at 2. Rather, Plaintiff emphasizes that his claims are that TTEC fraudulently induced him to execute the SPA through its direct representations to Plaintiff, not through its communications with his law firm, and he denies that the SPA requires him to sign a release "because he was not a party to any communications—written or oral—

7

wherein the terms of such a release were agreed upon." *Id.* Per the Plaintiff, these positions do not put privileged communications at issue and do not require the disclosure of privileged communications to resolve.

Plaintiff makes the slightly more subtle point that TTEC is painting with too broad a brush, unjustifiably lumping together documents relating to pre-LOI negotiations and actual negotiations of the LOI. Plaintiff also says that TTEC fails to differentiate between the SPA and other acquisition-related documents. Plaintiff says that through these "misleading labels," TTEC is improperly extending its arguments about an "at issue" waiver of the privilege, which concern only the actual LOI and SPA documents, to other types of documents listed on the privilege log. *Id.* at 5. Plaintiff says that the Court should conduct "at issue" waiver assessment as to each category of document highlighted in the privilege log. *Id.*

Plaintiff also argues that the mere fact that lawyers were involved in the drafting and negotiation of the transaction documents, and Plaintiff claims reliance on statements made by TTEC, his transaction counterparty, does not put his communications with his lawyers at issue. *See id.* at 6 (citing *In re Quest Software Inc. Shareholders Litig.*, No. 7357–VCG2013, 2013 WL 3356034, at *4 (Del. Ch. Ct. July 3, 2013), for proposition that "simple negation is not the equivalent of a reliance on advice of counsel that put the substance of the communication at issue").

### III. LEGAL STANDARD

Discovery exists to "advance issue formulation, to assist in fact revelation, and to reduce the element of surprise at trial," *IQ Hldgs., Inc. v. Am. Com. Lines Inc.*, 2012 WL 3877790, at *1 (Del. Ch. Aug. 30, 2012) (quoting *Levy v. Stem*, 1996 WL 742818, at *2

8

(Del. 1996)), and is based on the policy that the trial decision should result from "a disinterested search for truth." *Id.* (quoting *Hoey v. Hawkins*, 332 A.2d 403, 405 (Del. 1975)). This broad scope of discovery is limited by a number of privileges, including the attorney-client privilege, codified in Rule 502 of the Delaware Rules of Evidence, which protects from discovery certain communications between attorney and client. The rule reads as follows:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, (2) between the lawyer and the lawyer's representative, (3) by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

Del. R. Evid. 502(b).

The party who claims the privilege bears the burden of proof. Waiver is a voluntary and intentional relinquishment of a known right. "Since finding a waiver can produce harsh results, Delaware courts will only find a waiver of the attorney-client privilege in rare instances." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* C.A. No. 07C–05–171 CLS, 2008 WL 498294, at *3 (Del. Super., Jan. 14, 2008).

The attorney-client privilege, as reflected in Del. R. Evid. 502, is not absolute and can be restricted or denied entirely when a party places an otherwise privileged communication "at issue" in the litigation. *Zirn v. VLI Corp.*, 621 A.2d 773, 781 (Del. 1993). "The at issue exception [to attorney-client privilege] is based on principles of waiver and fairness intended to ensure the party holding the privilege cannot use it both

9

offensively and defensively." *Princeton Ins. Co. v. Vergano*, 883 A.2d 44, 59 (Del. Ch. 2005). A party places attorney-client communications at issue and waives attorney-client privilege when "(1) a party injects the privileged communications themselves into the litigation, or (2) a party injects an issue into the litigation, the truthful resolution of which requires an examination of confidential communications." *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 419 (Del. 2010). "Application of the at-issue exception is a fact-specific inquiry." *Id*. The notion of the exception is that a party should not be able to use the privilege as both as a shield (to prevent discovery of critical information) and a sword (making affirmative assertions that the privileged information might contradict). "[A] party may not make bare factual assertions, the veracity of which are central to the resolution of the parties' dispute, and then assert attorney-client privilege as a barrier to prevent a full understanding of the facts disclosed." *In re Kent Cty. Adequate Pub. Facilities Ordinances Litig.*, C.A. No. 2921-VCN, 2008 WL 1851790, at *5 (Del. Ch. Apr. 18, 2008) (quoting *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 259 (Del. 1995)). "In other words, a party cannot raise an issue that the party can only prove by examining confidential communications, and then attempt to shield those communications from discovery as privileged." *In re Comverge, Inc. Shareholders Litigation*, Civ. No. 7368-VCP, 2013 WL 1455827, at *3 (Del. Ch. April 10, 2013); *see also Wal-Mart Stores*, 2008 WL 498294, at *4 ("In Delaware, a party cannot make allegations, which are pivotal to the dispute, and then assert the attorney-client privilege to shield information that provides full understanding of that pivotal issue."); *Sealy Mattress Co. of N.J. v. Sealy*, No. CIV.A. 8853, 1987 WL 12500, at *6 (Del. Ch. June 19, 1987) ("As a general matter, a party cannot take a position in litigation and then

erect the attorney-client privilege in order to shield itself from discovery by an adverse party who challenges that position.").

The "at issue" exception or waiver to the attorney-client privilege implicates a two-part test. The information at issue must relate to the "pivotal issue in the current litigation and the need for the material must be compelling." *Williams Union Boiler v. Travelers Indem. Co.*, No. CIV.A.01C-11-001HLA, 2003 WL 22853534, at *1 (Del. Super. Ct. July 31, 2003). "Typically, compelling need is shown when the information is unavailable elsewhere." *Wal-Mart Stores*, 2008 WL 498294, at *4.

Examples of when the "at issue" exception have been found to apply include cases where a defendant called an investigator to impeach credibility of prosecution witnesses; where the issue was lack of good faith of an insurance company and required disclosure of the insurer's claim file; where reliance on advice of counsel was a defense, and where intent of the party was at the heart of the case. *Ramada Inns, Inc. v. Drinkhall*, 490 A.2d 593, 597 (Del. Super. Ct. 1985) (giving examples and citing cases).

Sometimes, even when an issue is deemed to have been injected by a party into the litigation and access to the allegedly privileged communications would "undoubtedly be helpful" in getting to the underlying truth of the allegations, a court will not pierce the privilege unless access to the disputed communications can be said to be "required" in order to achieve a "truthful resolution." *Alaska Elec. Pension Fund*, 988 A.2d at 419–20 (affirming Court of Chancery's decision not to permit discovery of privileged communications, in part because the depositions of the relevant counsel had not yet

11

taken place and "a more developed factual record would have assisted the trial court" in making the fact-specific inquiry needed for the application of any exception).

In *Tackett v. State Farm*, the Delaware Supreme Court held that an insurer had implicitly waived the attorney-client and work product privileges in an insurance bad faith case. The Court there explained that an insurer cannot make factual assertions in defense of a claim which incorporate, expressly or implicitly, the advice and judgment of its counsel, and then deny the opposing party an "opportunity to uncover the foundation for those assertions in order to contradict them." 653 A.2d at 259. In *Tackett*, the insurer denied any unreasonable justification for rejecting the insurance claim and asserted as an affirmative defense that the insureds had failed to supply information necessary for their claim to be processed. The court explained that while this defense did not directly relate to any protected communications, the asserted defense did suggest that there was nothing in the routine handling of the claim that contributed to the delay. In setting forth factors in support of its claim of reasonable justification for nonpayment of the claim, the insurer relied on an affidavit and claim file which purported to show "routine handling," presumably in part with the advice of counsel. This was enough for the court to conclude that the first prong of the waiver analysis—"disclosure of otherwise protected facts relevant to a particular subject matter relied upon as a defense"— was satisfied. *Id.* at 260.

The second aspect of the implicit waiver analysis requires that the party seeking disclosure be at a distinct disadvantage "due to an inability to examine the full context of the" information claimed to be privileged. *Id*. In the usual situation, the party seeking disclosure "will have no alternative source for obtaining the concealed information if the

12

privilege is upheld." *Id*. "Disclosure is thus required in order to promote the rationale with underlies waiver: 'fairness and discouraging use of the attorney-client privilege as a litigation weapon'." *Id*. (quoting *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 825 (Del. Super. Ct. 1992)).

Thus, in *Tackett*, once the insurer had alleged a routine handling of the insurance claim and suggested that any delay was attributable to inaction on the part of the insured, the insureds could challenge those allegations only with a full showing of the facts contained in the arguably privileged portions of the claim file. *Id.*

## IV. ANALYSIS

As the Court sees it, the critical fact issues in this case have to do with the state of mind and the intent of Plaintiff. Plaintiff insists that he injected into this lawsuit nothing about his attorney-client privileged communications. He says that his claims rely exclusively on what was represented directly to him by his TTEC counterparties or TTEC representatives. According to Plaintiff, what his lawyers knew, what they communicated to him, or what they thought the transaction documents embodied have not been injected by him into the case.

But the truth is that Plaintiff's state of mind in entering into the SPA, what he may have been warned about by his lawyers, and what he understood would or would not be carried forward from the LOI to the SPA, are important and relevant to the case. He is essentially proclaiming ignorance about what the SPA actually contains, saying that he instead relied on the prior writing (the LOI) and TTEC's oral representations in entering into the transaction. But he had sophisticated, learned counsel representing him in the transaction. Plaintiff's lawyers were doing due diligence and assisting in the drafting of

13

the transaction documents, and presumably communicated to him the important elements of the transaction. Transactional lawyers are retained both to protect their client and to do their client's bidding—to ensure that everything that the client wants to get out of a transaction is reflected in the documentation. Plaintiff cannot claim, on one hand, that he justifiably relied on the pre-transaction oral and written representations of TTEC's representatives as to what he was going to get, while simultaneously protecting from discovery the warnings and advice he may have been given by lawyers about the actual effect of the documents he was signing, including whether representations (oral or written) not reflected in the transaction documents could be binding. Indeed, as Plaintiff testified at his deposition, his lawyers may well have been partly to blame for leaving key terms out of the SPA: "Because there's more than one pair of eyes which were on all these documents. Right? But on TTEC's side, as well as the Jayaran Law side. So everybody had a—if there some key terms which were missed out, I think everybody has a role to play in that." ECF No. 151-2 at 100.

In terms of injecting his lawyer's communications into the litigation, on the issue of whether Plaintiff would have to sign a release in order to effectuate to eventual purchase of the remainder of his stock, Plaintiff in sworn interrogatory responses wrote,

> There was no agreement between Defendant and himself to the terms of any such "release" because no one from Defendant (including Defendant's counsel) or Jayaram Law ever communicated with him about any such terms, and he never approved or even saw a draft of any such terms . . . .

ECF No. 112-2 at 6. This places the communications with his law firm at issue in the case. The Court agrees with TTEC that it should not be required to accept Plaintiff's assertion that he had no knowledge of a material term of the agreement based merely on him saying that his lawyers did not tell or show him. TTEC should be entitled to

14

review those attorney-client communications to confirm the negative—that Plaintiff was ignorant of the release provision and that his lawyers never told him about those provisions. *See, e.g., Princeton Ins.*, 883 A.2d at 60–61 (where party seeks to distance herself from "the preparation and accuracy of important documents" prepared by her counsel and submitted on her behalf, the party has put her communications with counsel about those documents at issue).

The same can be said for the pre-deal discussions of TTEC supposedly offering "sponsorship," "support," investments, and specific clients. Plaintiff says that he supposedly relied on those representations by TTEC (including in the LOI) to execute the SPA, but they are found nowhere in the SPA itself. Plaintiff had sophisticated counsel representing him in connection both with the LOI and the SPA, yet he and his lawyers made no effort to ensure that those supposedly material promises were captured in the final transaction documents. Plaintiff cannot assert that he justifiably relied on oral or written pre-transaction representations by TTEC in entering into the SPA, while simultaneously shielding from discovery communications or warnings he may have received from his own counsel about the binding effect of the final transaction documents, and the failure to incorporate LOI terms or oral representations into the SPA.

The Court rejects Plaintiff's argument that the principle laid out in *In re Quest Software Inc. Shareholder's Litigation* is dispositive here. In *Quest Software*, attorneys sued for attorneys fees claiming that their own injunctive lawsuit generated a corporate benefit via a merger at a better share price, entitling them to fees. The corporate directors who ultimately accepted the more lucrative merger offer conceded that they

had been informed about the progress of the lawsuit, but asserted that it made no difference in the decision to accept the decisive offer and disputed that the lawsuit created any corporate benefit. The plaintiff attorneys sought access to attorney-client privileged communications (found in corporate minutes) between the directors and counsel to assess whether the litigation did in part influence the merger decision. The *Quest Software* court ultimately concluded that the disputed communications had not been put at issue by the director defendants, in part because the defendants were not relying on any privileged communications to make their case but were instead asserting that "*no communication* from counsel effected their actions with respect to the . . . merger. That simple negation is not the equivalent of a reliance on advice of counsel that put the substance of the communication at issue in this litigation." 2013 WL 3356034, at *4.

The Court finds the circumstances of this case different from *Quest Software*, and the need for access to the claimed privileged communications is more pressing than in that case. Here, Plaintiff makes assertions about his ignorance of the contents of transaction documents, the meaning of the contents, and the lack of certain alleged promises being contained in those documents. His experienced transactional lawyers were his agents and were intimately involved in negotiating, drafting, and formulating those documents. TTEC is entitled to see the communications between Plaintiff and his lawyers to assess the validity of his claims of ignorance or justifiable reliance on representations by TTEC.

The Court finds that the first part of the *Tackett* test has been met by TTEC. Plaintiff has injected his knowledge and/or ignorance of important provisions of the SPA

and the LOI into the case, and what his lawyers, who were intimately involved in negotiation those provisions and even drafted portions of the documents, may or may not have told him about the meanings of those provisions in the run-up to the execution.

Regarding the second part of the *Tackett* test, the Court finds that TTEC has no other means of learning the information that may have been communicated between counsel and Plaintiff than getting access to the disputed privileged documents. TTEC did depose one of Plaintiff's transactional lawyers who, for the most part, lacked any recollection of the lead up to the transaction. And Mr. Jayaram (who is litigation counsel in this case) insists he is not testifying at trial and was not deposed. Plaintiff has not offered up Mr. Jayaram for a deposition. The Court finds that TTEC has attempted, without success, to verify from alternative means the nature of Plaintiff's knowledge of the critical aspects of the transaction. Therefore, the second part of the *Tackett* test is met. The Court concludes that a truthful resolution of the disputed issues in this case requires an examination of the confidential communications.

## V.  CONCLUSION

The Court concludes that Plaintiff has injected the issue of his knowledge or ignorance of certain critical aspects of this transaction into the case, and the truthful resolution of those issues requires an examination of pre-transaction documents that Plaintiff asserts are privileged.

With respect to the various categories of documents identified by TTEC, the Court finds and orders as follows:

• Documents that involve the negotiation/execution of the SPA and related acquisition documents (712 documents): the **Motion to Compel is GRANTED and the documents should be produced.**

• Documents that involve the pre-LOI and LOI negotiation/execution (128 documents): the **Motion to Compel is GRANTED and the documents should be produced.**

• Documents which involve negotiations to sell Serendebyte to Luxoft and Tech Mahindra—other potential suitors besides TTEC (7 documents): the Court does not find sufficient injection of these issues into the litigation by Plaintiff and therefore the **Motion to Compel is DENIED**.

In sum, Defendant's Motion to Compel, ECF No. 111, is **GRANTED IN PART and DENIED IN PART**, as described above.

Date: September 17, 2024

N. Reid Neureiter
United States Magistrate Judge