IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:23-cv-01204-CNS-NRN

DILIP BALAKRISHNAN,

    Plaintiff,

v.

TTEC DIGITAL LLC, a Colorado limited liability company,

    Defendant.

**ORDER**

There are two pending Federal Rule of Evidence 702 motions before the Court. The first is Defendant and Counterclaim Plaintiff TTEC Digital LLC's motion to exclude the expert testimony of Allen E. Jacque, Mr. Balakrishnan's damages expert. ECF No. 130. The second is Plaintiff and Counterclaim Defendant Dilip Balakrishnan's motion to exclude the opinions of Sanjai Bhagat, TTEC's rebuttal damages expert. ECF No. 132. For the reasons explained below, the Court denies the competing expert motions.

**I.    FACTUAL BACKGROUND**

This case arises from the parties' execution of a February 7, 2020 Stock Purchase Agreement (SPA). ECF No. 150, ¶ 84; ECF No. 151-35 (SPA). In executing the SPA, TTEC acquired 70% of Serendebyte Inc., the company Mr. Balakrishnan founded. ECF No. 150, ¶ 25. Mr. Balakrishnan contends that he sold 70% of his company to TTEC after TTEC represented that it could provide Serendebyte access to TTEC's large enterprise

1

customers, and that Serendebyte could leverage TTEC's sales teams to sell Serendebyte's services. ECF No. 159 (Mr. Balakrishnan's statements of additional disputed facts), ¶ 6. Mr. Balakrishnan, however, argues that TTEC lacked the capacity to promote and sell Serendebyte, causing Serendebyte's revenue to plummet. *Id.*, ¶¶ 15–18. On May 8, 2023, Mr. Balakrishnan's counsel sent TTEC a litigation settlement demand, stating that

> Mr. Balakrishnan believes that TTEC has failed and/or refused to perform its obligations under the SPA in good faith, which has impeded the Company's ability to maximize the Aggregate Buyout Consideration Amount ("ABCA"). The ABCA provides the basis for the Rollover Shareholders' realization of a reasonable return upon their exercise of the Option. The ability to obtain a reasonable return was one of the foundational factors on which Mr. Balakrishnan and the Company decided to enter into the Transaction. Moreover, TTEC's failure to perform its obligations, and its refusal to provide any meaningful support in furtherance of the Company's growth, raise serious concerns regarding whether the Transaction was entered into by TTEC in good faith.

ECF No. 150, ¶ 100; ECF No. 47-2 (letter from Jayaram Law to TTEC). It does not appear that TTEC responded to Mr. Balakrishnan's letter prior to Mr. Balakrishnan filing suit on May 12, 2023—five days after Mr. Balakrishnan's counsel sent the litigation settlement demand.

After filing this lawsuit in May 2023, Mr. Balakrishnan attempted to sell the remaining 30% of Serendebyte to TTEC on December 8, 2023. ECF No. 150, ¶ 110; ECF No. 150-63 (Put Option letter signed by Mr. Balakrishnan). The SPA permitted Mr. Balakrishnan, on behalf of Serendebyte's rolling shareholders (including himself), to sell the remaining 30% during the period of January 31, 2023, to December 31, 2023, which

the SPA defines as the "Put Option." ECF No. 151-35 at 46 (§ 8.02). The buyout price for the remaining 30% of Serendebyte was based on Serendebyte's financial performance over the previous three-year period. *Id.* at 2 (defining pre-agreed formula).

Mr. Balakrishnan's exercise notice calculated the remaining 30% of the shares at $300,000. ECF No. 150-63 at 1. Mr. Balakrishnan identified the Put Purchase date as February 6, 2024. *Id.* TTEC agreed to process the Put Option request, provided that Mr. Balakrishnan complied with his obligations under §§ 8.02 and 8.04. According to TTEC, these obligations include signing a full release of all claims against TTEC, including this lawsuit. ECF No. 150, ¶ 112; ECF No. 150-64 (TTEC's response to Mr. Balakrishnan's Put Option letter). Mr. Balakrishnan refused, claiming that §§ 8.02 and 8.04 do not require a release for the Put Option to be exercised. ECF No. 159, ¶ 112; ECF No. 150-65 (Put Option reply letter).

## II.  PROCEDURAL BACKGROUND

As noted, Mr. Balakrishnan initiated this lawsuit on May 12, 2023. ECF No. 1. He alleged that TTEC breached its implied obligation under the SPA to support Serendebyte, and that TTEC fraudulently induced him to execute the SPA by falsely representing that it could and would support Serendebyte after the 70% acquisition. *See generally id.*; ECF No. 47 (Am. Compl.).

On November 16, 2023, after hearing argument, the Court dismissed without prejudice Mr. Balakrishnan's claims of breach of the implied duty of good faith and fair dealing, unjust enrichment, and negligent misrepresentation, but it permitted him to proceed with his fraudulent inducement claim. ECF No. 44. Mr. Balakrishnan filed his

Amended Complaint shortly thereafter, maintaining his fraudulent inducement claim and adding a breach of indemnification claim pursuant to the terms of the SPA. ECF No. 47.

Since Mr. Balakrishnan exercised the Put Option on December 8, 2023—seven months after filing his lawsuit—the parties have engaged in back-and-forth arguments concerning the purported release. ECF No. 150, ¶¶ 36–47 (setting forth purported undisputed facts concerning the release provisions); ECF No. 159 (denying the facts in ¶¶ 36–47). Having reached an impasse, on January 30, 2024, TTEC filed an Amended Answer to Mr. Balakrishnan's Amended Complaint, and at the same time, filed two counterclaims. ECF No. 67. TTEC first seeks a declaratory judgment that the SPA requires Mr. Balakrishnan to "execute a full release" of his claims. *Id.*, ¶¶ 77–96. TTEC's second claim for breach of contract seeks specific performance of the SPA (i.e., requiring Mr. Balakrishnan to execute a full release of all claims including the instant action). *Id.*, ¶¶ 97–124.

The same day it filed its counterclaims, TTEC filed a motion for declaratory judgment and motion for specific performance. ECF Nos. 68, 70. Shortly after TTEC filed its motions, on February 13, 2024, Mr. Balakrishnan moved to dismiss TTEC's counterclaims. ECF No. 77. Although there were others, the central issue before the Court in those motions was whether the SPA requires Mr. Balakrishnan to sign a full release of all claims prior to executing the Put Option.

Beginning with TTEC's motions, TTEC sought a declaration that Mr. Balakrishnan triggered an obligation to execute a release pursuant to § 8.02 of the SPA. ECF No. 68 at 7. TTEC asserted nearly identical arguments in its motion for specific performance—

4

asking the Court to order Mr. Balakrishnan to execute a full release of his claims. ECF No. 70. The Court denied both motions for the same reason: it determined that "release," as used in the SPA, is ambiguous. ECF No. 99 (order) at 11–12. To start, the SPA fails to identify any of the essential terms typically found in broad, enforceable releases (e.g., identifying the releasing and released parties, the timeframe of the release, and the scope of the release or claims being released). *Id.* Instead, the SPA requires Mr. Balakrishnan to deliver "an executed release in the form of Schedule 8.04"—a schedule which does not exist. *Id.* The Court went on to note that, at that stage, TTEC failed to provide any evidence of what the parties intended when they used the term release in the SPA, much less that it unequivocally meant "a full, final release" as TTEC contends. *Id.* (finding that, "[h]ad the parties, each sophisticated and represented by counsel, intended 'release' to mean 'full release' or 'complete release' in the SPA, they could have said so").

Turning to Mr. Balakrishnan's motion to dismiss, ECF No. 77, the Court first dismissed without prejudice TTEC's declaratory judgment claim as duplicative of its breach of contract claim. ECF No. 99. However, the Court declined to dismiss TTEC's breach of contract claim. Mr. Balakrishnan argued that TTEC's breach of contract claim was subject to dismissal because § 8.04 of the SPA is unenforceable as indefinite, and TTEC failed to sufficiently plead that it was damaged by the alleged breach. ECF No. 77 at 7–10. The Court explained that, based on the record before it, it could not conclude as a matter of law that "release," as used in the SPA, is indefinite. ECF No. 99 at 15–16. In a footnote, however, the Court noted that Mr. Balakrishnan asked for the opportunity to "elicit evidence—such [as] communications between Mr. Balakrishnan and TTEC,

5

communications internal to TTEC, and other evidence of the Parties' intent—showing that the Parties never agreed on the terms of a release under Section 8.04." *Id.* at 15 n.5 (quoting ECF No. 81 at 14–16).

Finally, on August 23, 2024, TTEC moved for summary judgment on each remaining claim in this lawsuit. ECF No. 150. The Court granted in part and denied in part TTEC's motion. ECF No. 177. The Court first determined that Delaware's three-year statute of limitations barred Mr. Balakrishnan's fraudulent inducement claim. *Id.* at 7–13. The Court then denied the remainder of TTEC's motion, finding that genuine disputes of material fact made summary judgment inappropriate. *Id.* at 14–19.

### III.   LEGAL STANDARDS

Rule 702 of the Federal Rules of Evidence, which governs the testimony of expert witnesses, provides that a

> witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702 (as amended on Dec. 1, 2023). Where, as here, a party challenges the admissibility of an expert witness, Rule "702 imposes upon the trial judge an important gate-keeping function with regard to the admissibility of expert opinions." *Mathis v. Huff*

*& Puff Trucking, Inc.*, 787 F.3d 1297, 1307 (10th Cir. 2015) (citation and quotation omitted). The proponent of expert testimony bears the burden—by a preponderance of evidence—of showing admissibility. Fed. R. Evid. 702; *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

To evaluate admissibility, the Court engages in a "two-step analysis." *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022). First, the Court must decide whether the proffered expert is qualified "by knowledge, skill, experience, training, or education" to render the opinion. Fed. R. Evid. 702; *see also Roe*, 42 F.4th at 1180. Second, if the expert is sufficiently qualified, the Court must determine whether the proffered opinions are reliable. *Roe*, 42 F.4th at 1180–81. "The reliability inquiry asks whether the methodology employed by an expert is valid—that is, whether it is based on sufficient data, sound methods, and the facts of the case." *Id.* at 1181 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). The Court also evaluates whether the expert reliably applied the methodology to the facts of the case. *Id.*

Experience alone may provide a sufficient foundation for expert testimony, but a witness relying solely on experience must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment. The Court's "gatekeeping function requires more than simply taking the expert's word for it." *Id.* (citation and quotation omitted).

But the Court's role as a gatekeeper under *Daubert* "is not intended to serve as a replacement for the adversary system." *Id.* (quoting *United States v. 14.38 Acres of Land*

7

*Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996)). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993)

The Court has substantial discretion to determine "*how* to perform its gatekeeping function under *Daubert*." *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019) (emphasis in original); *see also Roe*, 42 F.4th at 1180. That is especially true, where, as here, the trial is to the Court. The Tenth Circuit has held that "a judge conducting a bench trial maintains greater leeway in admitting questionable evidence, weighing its persuasive value upon presentation" at trial. *Att'y Gen. of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 780 (10th Cir. 2009) (rejecting Oklahoma's argument that the "district court committed a 'legal impossibility' in both admitting the [expert] testimony and subsequently finding it unreliable" (quoting Aplt. Br. at 45)); *see also In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("That is not to say that the scientific reliability requirement is lessened in such situations; the point is only that the court can hear the evidence and make its reliability determination during, rather than in advance of, trial. Thus, where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.").

8

## IV.   ANALYSIS & ORDER

### A.   TTEC's Motion to Exclude Allen Jacque (ECF No. 130)

Mr. Balakrishan retained Mr. Jacque to evaluate the damages he incurred as a result of TTEC's alleged refusal to support Serendebyte's growth and active hinderance of its growth to artificially deflate Serendebyte's value. *See* ECF No. 130-1 (Jacque Report). Mr. Jacque is a Chartered Financial Analyst and Certified Fraud Examiner. *Id.* at 20 (Jacque CV, attached to Jacque Report as App'x A). He holds a bachelor's degree in economics and finance from the University of Wisconsin and a master's degree in applied economics from Marquette University. *Id.*

Mr. Jacque provides a single damages opinion:

> Mr. Balakrishnan has incurred damages of between $3.75 million and $15.0 million due to his reliance on the false or reckless promises of TTEC. The $3.75 million reflects a buyout offer from Mr. Balakrishnan to TTEC on January 4, 2023 for the remaining 30% share of Serendebyte. This offer was rebuffed by TTEC. The $15.0 million represents the maximum amount TTEC would ever have had to pay for the remaining 30% share of Serendebyte.

*Id.* at 2. TTEC moves to exclude this opinion on the following five grounds: (1) Mr. Jacque is not qualified to give an expert opinion on "depressed EBITDA" or "lost sponsorship"; (2) his opinion is not based on specialized knowledge that will assist the trier of fact; (3) his testimony is not based on sufficient facts or data; (4) his testimony is not the product of reliable economic principles or methodologies; and (5) his opinion does not reflect a reliable application of economic methods to the facts in this case. ECF No. 130.

9

Because the parties will try this case to the Court, the Court will defer its *Daubert* analysis until it hears the evidence at trial.[1] *See Tyson Foods*, 565 F.3d at 779 ("[A] judge conducting a bench trial maintains greater leeway in admitting questionable evidence, weighing its persuasive value upon presentation."); *ORP Surgical, LLP v. Howmedica Osteonics Corp*, No. 1:20-CV-01450-RBJ, 2021 WL 5280192, at *5–6 (D. Colo. Nov. 12, 2021) (denying motion to exclude without prejudice to the defendant's right to request a hearing during the bench trial); *Mountain v. United States*, No. 19-CV-005-J, 2020 WL 8571674, at *2 (D. Wyo. Sept. 11, 2020) ("[T]rial courts conducting bench trials have the flexibility to admit proffered expert testimony and to then decide during trial whether the evidence meets the requirements of *Daubert* and Rule 702. . . . The trial judge is fully capable of sorting the wheat from the chaff at trial."); *Travelers Prop. Cas. Co. of Am. v. Barkley*, No. 16-61768-CIV, 2017 WL 4867012, at *1 (S.D. Fla. June 2, 2017) (summarily denying Daubert motion filed in advance of a bench trial).

The Court, however, will offer two preliminary observations on Mr. Jacque's opinion for the parties' consideration. The first is that Mr. Jacque's testimony appears to be run-of-the-mill damages testimony. Mr. Balakrishan asked him to opine on his damages had TTEC fulfilled its alleged contractual obligations. ECF No. 130-1 at 1. There is nothing exceptional about that purported testimony. The second observation is more nuanced.

---

[1] When parties move to exclude expert testimony under Federal Rule of Evidence 702, the parties are entitled to an evidentiary hearing before the witness may testify. Here, neither party requested an evidentiary hearing. ECF No. 130 at 2; ECF No. 140 at 15. The Court will not consider testimony that Mr. Jacque is not qualified to give or is otherwise irrelevant or unreliable within the meaning of Rule 702. *See Tyson Foods*, 565 F.3d at 779 (permitting trial court to admit questionable expert evidence but clarifying that "Daubert's standards must still be met"). The same is true for TTEC's rebuttal expert, Dr. Bhagat.

Mr. Balakrishnan has one remaining claim: breach of the SPA's indemnification provision. *See* ECF No. 151-35 (SPA, Article VII - Indemnification). The parties agree, as they must, that the SPA limits damages under the indemnification provision. For example, Section 7.05(g) provides that, "[i]n no event shall any Indemnifying Party be liable to any Indemnified Party for any punitive, *incidental, consequential, special or indirect damages, including loss of future revenue or income, loss of business reputation or opportunity* relating to the breach or alleged breach of this Agreement, or diminution of value or any damages based on any type of multiple." *Id.* at 42 (emphasis added). And Section 7.07(e) expressly prohibits "special losses": "No party will in any event be liable to any other Person *for any consequential [or] indirect . . . damages* of such other Person, including without limitation loss of future revenue, income, or profits, diminution of value, . . . except (i) if paid or payable to a third party, or (ii) in connection with any Fraud on the part of a Shareholder Party or the Company in connection with the Transactions." *Id.* at 44 (emphasis added). Mr. Balakrishnan argues that the Aggregate Buyout Consideration Amount[2] is not a form of consequential damages; it is a form of compensatory damages that the SPA recognizes.[3] ECF No. 140 at 15. He points to *eCommerce Indus., Inc. v. MWA Intel., Inc.*, which held that "lost profits are not considered consequential damages

---

[2] The SPA defines Aggregate Buyout Consideration Amount as the "amount equal to: (a) the product determined by multiplying (i) L TM EBITDA as set forth on the most recently available financial statement, .l2y (ii) 4.0 and then (b) multiplying the product of (i) and (ii) by thirty percent (30%); **_provided however that_** in no event shall Aggregate Buyout Consideration exceed $15,000,000. For illustrative purposes only, if LTM EBITDA is $10,000,000, then Aggregate Buyout Consideration is $12,000,000 (i.e, 4.0 x $10,000,000 x 30.0% == $12,000,000." ECF No. 151-35 at 2 (emphasis in SPA).

[3] He also argues that this provision does not apply to his fraud claim. ECF No. 140 at 15. The Court need not address that argument because the Court has since granted summary judgment in TTEC's favor on Mr. Balakrishnan's fraudulent inducement claim. *See* ECF No. 177.

when 'profits are precisely what the non-breaching party bargained for, and only an award of damages equal to lost profits will put the non-breaching party in the same position he would have occupied had the contract been performed.'" No. CV 7471-VCP, 2013 WL 5621678, at *47 (Del. Ch. Sept. 30, 2013) (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007)). The Court will determine whether Mr. Balakrishnan's purported damages (or what portions of his purported damages) are recognized under the SPA after hearing evidence at trial. It will then determine whether Mr. Jacque's opinion supports the recognized damages, if any.

TTEC's motion to exclude Mr. Jacque is denied at this time.

### B.   Mr. Balakrishnan's Motion to Exclude Dr. Sanjai Bhagat (ECF No. 132)

TTEC retained Dr. Bhagat as a damages rebuttal expert to Mr. Jacque. ECF No. 132-2 (Bhagat Report). Dr. Bhagat is a Provost Professor of Finance at the Leeds School of Business, University of Colorado at Boulder. *Id.* at 17 (App'x A). He also has held teaching stints as a Visiting Professor of Economics at Princeton University and a Visiting Associate Professor of Finance at the University of Chicago. *Id.* He holds a master's degree in applied economics and a Ph.D. in finance. *Id*.

Dr. Bhagat provides three opinions. First, he opines that the "Aggregate Buyout Consideration Amount (related to Section 8.02 in the [SPA]) is $0 (zero dollars), and not any of the amounts in Mr. Allen Jacque's report." *Id.* at 3. He explains that, given that Serendebyte's actual last twelve months (LTM) EBITDA in the fourth quarter of 2023 was negative $197,584, and because the Aggregate Buyout Consideration Amount under § 8.02 of the SPA is Serendebyte's LTM EBITDA multiplied by 4.0 multiplied by 30, the

12

correct Aggregate Buyout Consideration Amount (and therefore Mr. Balakrishnan's damages) is $0. *Id.* at 3–4, 6–12. Second, Dr. Bhagat opines that Mr. Balakrishnan's "allegation that subsequent to TTEC's acquisition of Serendebyte, TTEC failed to provide Serendebyte with opportunities for revenue growth, is logically inconsistent with the fundamental paradigm in corporate finance." *Id.* at 4. And third, he opines that Mr. Balakrishnan "never followed, and admits to not following, the dispute resolution mechanism detailed in the SPA." *Id.*

Mr. Balakrishan moves to exclude Dr. Bhagat's first opinion on the grounds that it unreliable, unsupported by the evidence, and is not helpful to the Court. ECF No. 132 at 6–10; ECF No. 152 at 2. He then moves to exclude Dr. Bhagat's second and third opinions on the grounds that they are improper rebuttal opinions, irrelevant, and improperly usurps the Court's role as factfinder and interpreter of the law. ECF No. 132 at 11–15.

Like TTEC's motion to exclude Mr. Jacque, the Court will defer its *Daubert* analysis until it hears the evidence at trial—particularly Mr. Jacque's testimony. *See Tyson Foods*, 565 F.3d at 779; *ORP Surgical*, 2021 WL 5280192, at *5–6. Also like above, the Court provides two initial impressions of Dr. Bhagat's opinions to assist the parties in their trial preparation.

First, if the Court permits Mr. Jacque to testify, it very likely will find Dr. Bhagat's first opinion relevant and helpful. Mr. Balakrishan's argument that his opinion should be excluded because he relied on actual facts rather than the opposing side's assumptions is unpersuasive. True, economic experts *may* assume liability in calculating damages. *See BC Tech., Inc. v. Ensil Int'l Corp.*, 464 F. App'x 689, 704 (10th Cir. 2012) ("The

13

assumptions were certainly subject to debate but had sufficient evidentiary support to pass the admissibility threshold."); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1526 (10th Cir. 1984) ("If the calculations upon which the loss of profits are based are estimated in any reasonable way and the underlying assumptions on which the [expert] relied are not without support in the record, the calculations may be upheld as a valid means of measuring loss of profits." (citation and quotation omitted)), *aff'd*, 472 U.S. 585 (1985); *see also Orthoflex, Inc. v. ThermoTek, Inc.*, 986 F. Supp. 2d 776, 792 (N.D. Tex. 2013) ("Experts are permitted to assume the fact of liability and opine about the extent of damages."); *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 737, 741 (N.D. Ill. 2009) ("[Witness] is an expert on damages, not liability, and she seeks to opine only on what the damages should be *if* the jury separately finds the facts she assumes to be true."). But Mr. Balakrishan does not cite any authority requiring exclusion of a rebuttal expert where the expert relied on actual, as opposed to the affirmative expert's assumed, facts.[4]

---

[4] Mr. Balakrishan cites *Nephron Pharms. Corp. v. Hulsey* for the first time in his reply. There, the court explained in a footnote that

> [i]t is baffling to the Court that Defendants would put forth a rebuttal expert *who simply opines that there are no damages because, in his opinion, there is no liability*. This opinion offers no insight into Distler's methods, is not helpful to the finder of fact, and simply serves to mislead the jury on the issues of liability in this case. The Court is also not amused by Defendants' contention that because Distler assumes liability for the purposes of calculating damages, Wiggins is equally justified in assuming no liability to offer his damages opinion.

No. 618CV1573ORL31LRH, 2021 WL 1110907, at *2 n.2 (M.D. Fla. Jan. 11, 2021). Unlike the expert in *Nephron*, Dr. Bhagat provides a detailed analysis as to why he determined that the Aggregate Buyout Consideration Amount is $0. *See* ECF No. 132-2 at 6–12. The Court thus finds *Nephron* distinguishable and unsupportive of Mr. Balakrishan's argument.

Second, although the Court will not exclude Dr. Bhagat's second and third opinions at this time, the Court is somewhat persuaded by Mr. Balakrishan's arguments that these opinions go beyond the scope of Mr. Jacque's opinions. This, of course, will depend on what testimony, if any, Mr. Jacque is permitted to provide at trial. The Court will withhold its ruling on this issue for now, but the Court expects Dr. Bhagat's testimony to rebut actual testimony and not merely further TTEC's affirmative claims.

## V.  CONCLUSION

Consistent with the above analysis, the Court DENIES the parties' motions to exclude expert testimony. ECF Nos. 130, 132.

DATED this 6th day of February 2025.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge